**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SEER, INC. and THE BRIGHAM AND WOMEN'S HOSPITAL, INC. <br><br> *Plaintiffs*, <br><br> v. <br><br> NANOMICS BIOTECHNOLOGY CO., LTD. <br><br> *Defendant*. | Case No. 26-cv-5498 <br><br> **JURY TRIAL DEMANDED** |

<u>**COMPLAINT FOR PATENT INFRINGEMENT**</u>

Plaintiffs Seer, Inc. ("Seer") and The Brigham and Women's Hospital, Inc. ("BWH") (collectively, "Plaintiffs") file this Complaint against Defendant Nanomics Biotechnology Co., Ltd. ("Nanomics" or "Defendant") for patent infringement under 35 U.S.C. § 271 and allege as follows:

**INTRODUCTION**

1. Proteins are the functional drivers of biology and the primary targets of therapies to treat diseases. Identifying specific proteins that serve as "biomarkers" for diseases is difficult, however, in part because the molecular diversity of the proteome—*i.e.*, the complete set of proteins in an organism at a given time—is large and dynamic. Before Plaintiffs' patented inventions, it was nearly impossible to reliably and broadly detect low abundance proteins in biological samples using mass spectrometry because high abundance proteins masked or obscured the less abundant proteins that were of most interest to researchers and practitioners.

2. While completing his residency at BWH, the teaching hospital affiliated with Harvard Medical School, Dr. Omid Farokhzad and his co-inventors set out to address these and other obstacles. Rather than employ expensive and time-consuming fractioning or specific depletion mechanisms to remove the high-abundance proteins to "unmask" the low-abundance proteins of interest, Dr. Farokhzad tried something new. Specifically, Dr. Farokhzad used the more robust approach of employing multiple nanoparticles with different physiochemical properties to assay a biological sample. This approach was counterintuitive because it expanded the dynamic range of the proteins being analyzed rather than minimizing it as much as possible. This "unbiased" approach to assaying biological samples was a scientific breakthrough that gave researchers deep, rapid, and large-scale access to the body's proteins. It also led Dr. Farokhzad and his co-founders to form Seer.

3.       Seer's Proteograph® Product Suite and proprietary workflow ("Proteograph Platform") have revolutionized proteomics.  Plaintiffs' inventions embodied in the Proteograph Platform enable researchers and practitioners to identify up to 10x more protein groups than traditional methods, analyze 1,000+ biological samples per week, and to discover and detect the biomolecule fingerprints of countless debilitating diseases, supporting advances in the monitoring and treatment of those diseases.

4.       The Proteograph Platform has achieved broad market adoption and commercial success, highlighted by Seer's partnership with Thermo Fisher Scientific to accelerate adoption of Plaintiffs' patented proteomic technologies.  Major institutions have also committed to population-scale deployments of the Proteograph Platform, including Korea University's unprecedented 20,000-sample cancer biomarker study.  Seer's ranking on the Deloitte Technology Fast 500, with 2,440% revenue growth, underscores both its commercial momentum and durable competitive positioning.

5.       Nanomics witnessed Seer's success and recognized the commercial opportunity Seer was creating.  However, rather than seek to enter into a partnership with Seer to contribute to this important and growing field, Nanomics baldly copied Plaintiffs' patented inventions.  To make matters worse, Nanomics uses foreign manufacturers to undercut Seer's prices.  Today, Nanomics trades off Seer's success with an inferior knock-off product, which Nanomics calls the Proteonano Ultraplex Proteomics Platform ("PUP Platform").  According to Nanomics, the PUP Platform consists of "unique magnetic nanoparticles based reagents" and an "automatic sample processing workstation," amongst other products that infringe Plaintiffs' patented inventions.  Ex. 11.  But far from being "unique," Nanomics products are copy-cats of Plaintiffs' proprietary and hard-earned inventions.

6. Plaintiffs bring this action to stop Nanomics' unlawful conduct.

## THE PARTIES

7. Plaintiff Seer, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 3800 Bridge Parkway, Redwood City, California 94065.

8. Plaintiff The Brigham and Women's Hospital, Inc., is a not-for-profit corporation organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business at 75 Francis Street, Boston, Massachusetts 02115.

9. On information and belief, Nanomics is a Chinese company with its headquarters at 400 Fucheng Road, 5th Floor, Building 6, Hangzhou, Zhejiang 310018.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

11. This Court has personal jurisdiction over Nanomics consistent with the requirements of the Due Process Clause of the United States Constitution and the Illinois long-arm statute. On information and belief, Nanomics has sufficient minimum contacts with the forum because it transacts substantial business in Illinois, including but not limited to the sale of infringing products in Illinois. Further, Nanomics has, directly or through intermediaries, committed and continues to commit acts of patent infringement in Illinois, as alleged more particularly below.

12. Evidencing Nanomics' minimum contacts with Illinois, Nanomics maintains a U.S. headquarters in Chicago, Illinois, according to its own documentation, including its LinkedIn page:



*See* https://www.linkedin.com/company/nanomics-biotech/about/.

13.     On information and belief, Nanomics' Chicago headquarters is located at 1724 E. 54th St., Chicago, Illinois 60615, where one of its directors is based.

14.     As another example, Nanomics' Chinese-language website also indicates that Chicago is the company's United States headquarters:



*See* https://www.nanomics.bio/article-item-35.html.

15.     As yet another example, Datasheets[1] for Nanomics' infringing products also feature a map indicating Nanomics' headquarters in Chicago, Illinois:

---

[1] *See* Tech Note, "Nanomics Proteonano™ Plasma Proteome Enrich Kit" , available at: https://cea4e43c-abdb-45a5-b8b3-0ff738ca3fbf.usrfiles.com/ugd/cea4e4_4dc3734278f44faaa9e8a684ff0832e2.pdf, at 4.  This map is also available in documents from Nanomics' U.S. distributor.  *See* https://resource.amerigoscientific.com/pdf/Automate+SP3+Proteome+Workflow+via+Proteonan oTM+Platform.pdf, at 4.



16. Consistent with locating its headquarters in Chicago, Illinois, Nanomics has personnel located in the Chicago area. For example, according to the LinkedIn profile of Nanomics' Founder & CEO, Hao Wu, Nanomics has "open positions in Chicago," as well as in Hangzhou:



*See* https://www.linkedin.com/in/haowu-uchicago/.

17. As another example, Nanomics executives reside in the Chicago area and operate Nanomics' business from Illinois. For example, Samuel Weng, Nanomics' CTO and US Director,[2] resides in the "Greater Chicago Area," according to his LinkedIn profile:

---

[2] *See* https://www.nanomics.ai/about-us ("Our Team") and https://www.nanomics.ai/team-3 ("Our Team").



*See* https://www.linkedin.com/in/samuel-shao-huan-weng-06ba9a58/.

18.     On information and belief, Nanomics' director and co-founder Dr. Le Shen also lives and works in Chicago, and continues to work for Nanomics, including marketing Nanomics infringing products.  *See, e.g.*, https://www.linkedin.com/posts/nanomics-biotech_asms2025-nanomicsbiotech-proteonano-activity-7336395713959923713-W2tZ/.

19.     Nanomics also offers and uses its infringing products in this District.  For example, on information and belief, Nanomics makes such products available on its U.S. distributor's website, which is accessible in this District.  *See, e.g.*, "Proteonano™ SP3 Proteome Extract Kit," Amerigo Scientific, available at: https://www.amerigoscientific.com/proteonano-sp3-proteome-extract-kit-item-518342.html.

20.     Further, Mr. Weng or others have used and, on information and belief, continue to use Nanomics' infringing products at the University of Chicago.  According to a LinkedIn post by Nanomics' CEO, "The UChicago team evaluated Proteonano" and showed that Nanomics' infringing product provided "[d]eeper protein coverage (2,100+ proteins v. ~ 800 with depletion)" when compared to more traditional depletion methods.  Mr. Weng also describes using the infringing Nanomics products in a video featured in the post.



*See* https://www.linkedin.com/posts/haowu-uchicago_proteomics-massspectrometry-proteonano-ugcPost-7397200520064491520-djPe/.

21.     In the alternative, this Court has personal jurisdiction over Nanomics pursuant to Federal Rule of Civil Procedure 4(k)(2) because of Nanomics' contacts with the entire United States.

22.     Nanomics has sold or provided its infringing products to customers throughout the United States.  For example, Nanomics' Chinese-language website provides (translated into English): "One year after its product launch, the Proteonano™ Low Abundance Protein Enrichment Kit has been adopted by more than 100 universities, top-tier hospitals, and research institutes both domestically and internationally, and has also been exported overseas, including to the world's top 10 universities and institutions such as the Pacific Northwest National Laboratory in the United States."  *See* https://www.nanomics.bio/article-item-34.html.

23.     Nanomics' Chinese-language website also lists the University of Buffalo, Harvard Medical School, and the Pacific Northwest National Laboratory as United States enterprise partners.



*See* https://www.nanomics.bio/p-about.html.

24.     By way of further example, another translation from Nanomics' Chinese-language website shows a news article dated December 31, 2025, stating the following: "As of 2025, our customers are located in many countries and regions, including Germany, Australia, the United States, and Japan . . . . In 2025, we completed 20 Proteonano™ proteomics platforms in Germany, Australia, the United States and other locations . . ." *See* https://www.nanomics.bio/article-item-39.html.

25.     Nanomics has also represented to the United States government that it has sold or transported its products into the United States.  On May 1, 2025, Nanomics filed for a U.S. trademark for the mark "PROTEONANO" (Serial No. 99165555) attesting that its mark was first "use[d] in commerce" in the United States "at least as early as 06/02/2024."  Ex. 12 at 1.  On information and belief, Nanomics has used its PROTEONANO mark in commerce in the United States at least by and through its sales of the infringing PUP Platform in the United States.

26.     Nanomics has further attended conferences in the United States to present its infringing products.  For example, in February 2026, Nanomics attended a conference in St.

Louis, Missouri, where it unveiled its Proteonano HT Assay and Proteonano G1 Pro Proteomics

Workstation, both of which infringe Plaintiffs' patented inventions.



*See* https://www.linkedin.com/posts/nanomics-biotech_hello-from-st-louis-the-nanomics-team-activity-7431358525664276480-qbwQ.



*See* https://www.nanomics.bio/article-item-47.html.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) and 28 U.S.C.

§ 1391 because Nanomics has committed acts of infringement and is subject to personal

jurisdiction in this District.

**PATENTS-IN-SUIT**

28. On September 6, 2022, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 11,345,360 ("the '360 patent") entitled "System and Sensor Array." A true and correct copy of the '360 patent is attached as Exhibit 1.

29. On April 18, 2023, the USPTO duly and legally issued U.S. Patent No. 11,630,112 ("the '112 patent") entitled "Systems and Methods for Sample Preparation, Data Generation, and Protein Corona Analysis." A true and correct copy of the '112 patent is attached as Exhibit 2.

30. On July 30, 2024, the USPTO duly and legally issued U.S. Patent No. 12,050,222 ("the '222 patent") entitled "Systems and Methods for Sample Preparation, Data Generation, and Protein Corona Analysis." A true and correct copy of the '222 patent is attached as Exhibit 3.

31. On February 18, 2025, the USPTO duly and legally issued U.S. Patent No. 12,228,566 ("the '566 patent") entitled "System and Method for Protein Corona Sensor Array For Early Detection of Diseases." A true and correct copy of the '566 patent is attached as Exhibit 4.

32. On March 31, 2026, the USPTO duly and legally issued U.S. Patent No. 12,590,948 ("the '948 patent") entitled "Systems and Methods for Discovery and Analysis of Markers." A true and correct copy of the '948 patent is attached as Exhibit 5.

33. BWH is the sole owner of all rights, title, and interest to the '360 and '566 patents. In December 2017, BWH licensed to Seer the exclusive right to develop, make, use, offer for sale, sell, import, and export products and processes that would infringe one or more claims of the '360 and '566 patents.

-11-

34. Seer is the sole owner of all rights, title, and interest to the '112, '222, and '948 patents.

35. Plaintiffs have the right to recover all damages for past, present, and future infringement of the '360 patent, the '112 patent, the '222 patent, the '566 patent, and the '948 patent (collectively, the "Patents-in-Suit" or "Asserted Patents"), and to seek injunctive relief as appropriate under law.

**FACTUAL BACKGROUND**

36. Proteins are the functional drivers of biology and the primary targets of most approved drugs. Unlike DNA, which is largely static over an individual's lifetime, the proteome is dynamic and reflects real-time biological processes, disease states, and responses to therapeutic intervention.

37. Proteomics (the study of proteomes) can provide a wide range of biological insights including disease-related changes in protein abundance (*i.e.*, the concentration of certain proteins in a biological sample) and form (*e.g.*, how they are modified after they are translated from mRNA). However, it is estimated that there may be over one million distinct protein variants, called proteoforms, so researchers and practitioners have struggled to comprehensively characterize protein biology at scale. This has resulted in a limited ability to detect the earliest stages of diseases, anticipate the path a disease may take in one patient versus another, predict the likelihood of responses for an individual to particular treatment, and preempt the possible adverse effects of treatment on a particular individual.

38. Prior to Plaintiff's inventions, researchers and practitioners had tried using mass spectrometry to analyze the identity and concentration of proteins in various biological samples, but the complexity of the protein mixture in such samples made the readings unreliable and

uninformative beyond a very narrow dynamic range. In blood plasma, for example, a handful of proteins are present in such high concentrations that the concentration of the low-abundance proteins (of greatest interest), could not be detected reliably because the high-abundance proteins in the same volume obscured or masked the low-abundance proteins. For example, "high abundance" proteins like albumin and globulins make up approximately 90% of the plasma's protein concentrations, masking the detection of low-abundance proteins (*i.e.*, proteins typically present in plasma samples at a concentration of 100ng/ml or less) in non-enriched plasma samples. These low abundance proteins are considered to be of the greatest clinical importance as "biomarkers" of disease. In many cases, because of these challenges, the proteins of interest could not be detected at all, much less reliably and reproducibly. Because of the technological limitations for overcoming this unequal concentration of proteins in a sample, the literature commonly disregarded low-abundance proteins.

39. To address this problem, scientists traditionally employed one of two approaches: (1) specific depletion, or (2) specific enrichment. In specific depletion approaches, the high-abundance proteins were targeted by contacting the samples with binding agents having a high specificity for the high abundance proteins and removing the binding agent-high abundance protein complexes from the sample. Such approaches to depleting the input material being analyzed included an expensive, time-intensive, and laborious technique called fractionation, and other mechanisms for targeting high-abundance proteins. Such approaches were ultimately ineffective, though, because they continued to obscure the low-abundance proteins in the biological sample that interacted with, and were inadvertently removed with, the high-abundance proteins. In specific enrichment approaches, scientists attempted to decrease the complexity of the input material being analyzed by targeting a predetermined protein or limited set of proteins

for specific enrichment. For example, an individual particle type tailored to specifically bind to and thereby enrich particular proteins of interest could be identified and employed to *narrow* the dynamic range of the proteins being analyzed to the maximum extent possible. Researchers thus sought to develop a given nanoparticle that was tuned to selectively isolate specific biomarkers of interest for disease diagnosis, prognosis, and monitoring. Limiting the complexity of the input material for a given sample was understood to be essential for reliably detecting the low-abundance proteins most relevant to these applications, but the bias inherent in such approaches prevented the discovery of new, more powerful biomarkers. Moreover, as with specific depletion approaches, specific enrichment approaches often shared the downsides of being slow, laborious, small-scale solutions.

### A. Plaintiffs' Inventions

40. Dr. Farokhzad set out to find an innovative solution to these technical obstacles. While completing his residency at Havard Medical School at BWH, Dr. Farokhzad decided to take a different approach than the literature provided. Instead of restricting his analysis to a small number of proteins captured by targeted nanoparticles, Dr. Farokhzad combined the use of multiple non-specific nanoparticles, each with different physiochemical properties, to capture and analyze the results from the resulting protein coronas (*i.e.*, the layer of protein that accumulates on the surfaces of the nanoparticles) to provide an unbiased and robust panel of proteins for identifying relevant biomarkers. He found that this counterintuitive approach, which increased the complexity of the analysis rather than minimizing it, surprisingly helped to assay the biological sample by detecting the low abundance proteins that were of greatest interest to researchers and practitioners. In contrast to earlier approaches, Plaintiffs' patented inventions

counterintuitively *expanded* the dynamic range of proteins that could be analyzed by mass spectrometry, thereby providing an unbiased platform for deep, rapid analysis of the proteome.

41. In 2017, Dr. Farokhzad and his eminent co-founders established Seer to create a suite of products that embody these technological advances. Seer's Proteograph® Product Suite and workflow (the "Proteograph Platform") includes an assay kit, an automation instrument, and Seer's data analysis software.



*See* https://investor.seer.bio/static-files/4ca8cb4c-08b4-4301-998b-f2fe0037d300, at 7.

42. Seer's assay kit is a consumables package containing Seer's proprietary engineered nanoparticles, reagents, plasticware, and controls for protein enrichment of 40 or 80 samples at a time. Notably, Seer's proprietary engineered nanoparticles are also magnetic, and specifically superparamagnetic, allowing them to be easily concentrated at the bottom of a well in a well plate, a feature critical to rapid, automated sample processing. Seer's automation instruments—currently, the SP100 and SP200 Automation Instruments—use Seer's assay kits to perform sample processing and peptide preparation for mass spectrometry-based sample analysis, and includes methods for desalting, quantification, and reconstitution of peptides obtained from digestion of the proteins contained in the coronas formed on the nanoparticles. Once the peptides have been analyzed using a mass spectrometer, researchers upload the raw

data files to Seer's data analysis software—currently, the Proteograph Analysis Suite—to process their results.

43.     Plaintiffs' patented inventions embodied in the Proteograph Platform consist of a number of steps.  *See, e.g.*, https://www.youtube.com/watch?v=jWPKiL9fsBw.  Among these, Seer's superparamagnetic nanoparticles (comprised of multiple particle types) are combined with a volume of a biological sample to enable nanoparticle-protein interaction and resulting corona formation.  The specific protein corona that is formed depends on the physicochemical properties of the particle type.  This step can be performed by aliquoting a volume of a biological sample into a well of a 96 well-plate using Seer's automated instrument.  Experimental control samples are also loaded onto the well-plate.  Seer's nanoparticles also are loaded into each well.





*See* "Advancing Analytical Throughput and Depth in Plasma Proteomic Studies and the Proteograph ONE Workflow" ("Seer Technical Note"), available at: https://omixys.pl/wp-

content/uploads/2025/07/Tech-Note-Advancing-Analytical-Throughput-and-Depth-in-Plasma-Protemoins-Studies-with-Proteograph-ONE-Workflow.pdf, at 2-3.

44.     The nanoparticles are then incubated with the biological sample for around an hour.  During incubation, an equilibrium is achieved, with certain low abundance proteins counterintuitively being over-represented in a corona as compared to high abundance proteins in relation to their concentrations in the starting biological sample.  Seer's platform then uses a magnet to pull down the corona-covered nanoparticles to the bottom of the well so that the supernatant (remaining fluid from the biological sample) can be removed, after which the particles are washed to remove proteins from the biological sample that are not part of the coronas or that are only weakly bound to the particles, along with removing other contaminants.



*See id.* at 3.

45.     Corona proteins are then denatured, reduced, alkylated, and digested, producing a solution of tryptic peptides.  Total protein content is subsequently quantified using a fluorescence spectrometer, and the peptides are dried.  The automation instrument reconstitutes the peptides in a solution to yield a peptide concentration desirable for testing, and the peptides are made ready for mass spectrometry analysis.





*See id.*

46.     After mass spectrometry, the resulting data is transferred to the Proteograph Analysis Suite for peptide and protein identification, quantification, and other analysis designed to capture biological insights.



*See id.*

47.     Since its launch, Seer's Proteograph Platform has served more than 190 customers in more than 20 different countries, including at leading academic institutions, biopharmaceutical

companies, biobanks, and clinical research organizations. With the help of the Proteograph

Platform, Seer's customers can now conduct deep, highly reproducible, unbiased proteomic

studies at scales involving tens to tens-of-thousands of samples, quantifying thousands of

proteins and hundreds of thousands of peptides, and generating data suitable for large-scale

statistical analysis.

48. Important to Seer's commercial success is its partnership with Thermo Fisher

Scientific, under which Thermo Fisher's global sales force can directly quote and sell the

Proteograph Product Suite alongside Orbitrap Astral mass spectrometers, giving Seer access to

the world's largest life science commercial distribution channel. *See* "Seer Enters into a Co-

Marketing and Sales Agreement with Thermo Fisher Scientific" (Nov. 6, 2024), available at:

https://investor.seer.bio/news-releases/news-release-details/seer-enters-co-marketing-and-sales-

agreement-thermo-fisher. Major institutions have also committed to population-scale

deployments of the Proteograph Platform, including Korea University's unprecedented 20,000-

sample cancer biomarker study and Singapore's PRECISE-SG100K initiative profiling 10,000

participants. *See* "Seer's Proteograph Platform Enables Unprecedented 20,000-Sample

Proteomics Study with Korea University to Develop AI-Driven Diagnostics for Cancers in

Young Adults" (June 1, 2025), available at: https://investor.seer.bio/news-releases/news-release-

details/seers-proteograph-platform-enables-unprecedented-20000-sample; "Seer and Precision

Health Research, Singapore Sign Collaboration to Provide Deep, Unbiased Proteomics on 10,000

PRECISE SG100K Samples" (Apr. 9, 2026), available at: https://investor.seer.bio/news-

releases/news-release-details/seer-and-precision-health-research-singapore-sign-collaboration.

The platform has attracted leading researchers across dozens of institutions, from Weill Cornell

and the University of Wisconsin-Madison to the Knight Cancer Institute and Fred Hutchinson

Cancer Center, who have publicly praised its performance. Seer's ranking on the Deloitte Technology Fast 500, with 2,440% revenue growth, underscores both commercial momentum and durable competitive positioning. *See* "Seer Ranked Number 57 Fastest-Growing Company in North America on the 2024 Deloitte Technology Fast 500™" (Nov. 21, 2024), available at: https://investor.seer.bio/news-releases/news-release-details/seer-ranked-number-57-fastest-growing-company-north-america-2024.

49.     In connection with these scientific and commercial advancements, Plaintiffs have applied for, prosecuted, acquired, and been awarded patent protection for a number of inventions, including the patents asserted in this Complaint.

### B.     Nanomics Copies Plaintiffs' Inventions

50.     Nanomics purports to be committed to creating a "world-class artificial intelligence digital proteomics platform to access human proteome and discover biomarkers in unprecedented ways leading the early detection of cancer and other diseases." *See* https://www.nanomics.ai/about-us.  While a laudable goal, Nanomics has not pursued its mission fairly, instead copying Seer's platform to practice each and every limitation of the Patents-in-Suit, which patents also embody Seer's Proteograph Platform.

51.     According to Nanomics, the Proteonano Ultraplex Proteomics Platform ("PUP Platform") consists of the Proteonano Kit, Nanomics G1 Workstation, and AI-powered proteomics analysis software (collectively, "Accused Products" or "Accused Technology"), and specifically addresses the bottlenecks in detecting low-abundance proteins in mass spectrometry-based proteomics.



*See* https://www.linkedin.com/pulse/how-use-proteonano-platform-robust-fast-large-cohort-blehc/. A comparison of this visual to Seer's visuals further illustrates Nanomics' copying:



*See* https://investor.seer.bio/static-files/4ca8cb4c-08b4-4301-998b-f2fe0037d300, at 7.

52. Nanomics has several iterations of the Proteonano Kit, including but not limited to the Proteonano SP3 Proteome Extract Kit, the Proteonano Plasma Proteome Enrichment Kit, the Proteonano EV Proteome Enrichment Kit, the Proteonano Mouse Plasma Proteome Enrichment Kit, the Proteonano CSF Proteome Enrichment Kit, the Proteonano Urine Proteome Enrichment Kit, the Proteonano Saliva Proteome Enrichment Kit, and the Proteonano HT Assay, (collectively, "Proteonano Kits").

53. Like Seer's Proteograph Platform, Nanomics' PUP platform is meant to enable "[p]rotein enrichment by nano-bio interaction" to "selectively capture low abundant proteins in biological samples[]" and, thereafter, these "peptides are weighted and sequenced by high-resolution mass spectrometers." *See* "Nanomics: A Scalable and Standardized Workflow for

-21-

Large-Cohort Proteomics" at 3, available at

https://resource.amerigoscientific.com/pdf/A+Scalable+and+Standardized+Workflow+for+Large
-Cohort+Proteomics.pdf.   And, like the Proteograph Platform, Nanomics' ProteonanoKit uses

"superparamagnetic" nanoparticles for this process:



*See* Ex. 13.

54.      Even more, Nanomics markets that the Proteonano Kits contain multiple

nanoparticle types.  For example, a Nanomics publication describing the Accused Technology

explains that the "Proteonano[TM] Kit is composed of AI-designed polypeptides to selectively bind

-22-

and enrich low abundance proteins (LAPs) in biofluid samples with high specificity and sensitivity." Ex. 11 at 8; *see also* Ex. 15 at 29 ("the PUP Platform achieved cutting-edge deep plasma proteome coverage and data quality by effectively combining multiple nanoparticles into a single, uniform reagent").

**1. Proteonano nanoparticles**

The Proteonano Enrich Kit is composed of hierarchically structured nanoparticles functionalized with peptides (PCNPs). The physicochemical properties of three peptides used in this work are shown in Supplemental Table 1.

**Supplemental Table 1.** The physicochemical properties of three peptides

| Name | Sequence | Length | $M_w$ | Isoelectric Point | Charge (mV) | Hydrophobicity | GRAVY |
|------|----------|--------|-------|-------------------|-------------|----------------|-------|
| PP1 | HKAATKIQASFRGHITRKKLC | 21 | 2,395 | 11.73 | 0.30 | 38% | -0.65 |
| PP2 | DIEEVEVRSKYFKKNERTVEC | 21 | 2,602 | 4.90 | -1.04 | 62% | -1.22 |
| PP3 | QETLKDTRSKFFNKPSMTVVC | 21 | 2,460 | 9.73 | 1.95 | 48% | -0.63 |

*See also* Ex. 14 at 2.

55. Further like Seer's platform, Nanomics uses a 96 well-plate in which the nanoparticles are incubated with the biological sample to form coronas before a magnet is used to separate the corona-covered particles from the remainder of the biological sample. For example, the Nanomics' G1 workstation "includes a heater-shaker module for nanoparticle-plasma incubation" and "a magnetic module for protein corona separation." Ex. 15 at 7.



*See* Ex. 11 at 10 (Fig. 2).



**Supplemental Figure. 2** A typical quality control sample configuration on a 96 well plate. **QC 1**: QC1 is a lyophilized peptide mix derived from pooled healthy human plasma that has undergone protein enrichment, reduction, alkylation, enzymatic digestion, and desalting. QC1 is used to monitor the reproducibility of peptide signal readout by LC-MS/MS instruments and typically performed twice on a 96 well plate. **QC 2**: QC2 uses pooled healthy donor plasma without being enriched (neat plasma) and processed to undergo sample reduction, alkylation, enzymatic digestion, desalting, and lyophilization, thus monitoring the quality of conventional procedures during sample preparation. Usually, one QC2 sample is included per 96-well plate. **QC 3**: QC3 uses pooled healthy donor plasma, but undergoes nanoparticle-based protein capture, in addition to conventional steps of MS-based proteomic sample preparation. Thus, the performance of the complete processing pipeline is monitored. By comparing results obtained from QC1 and QC2, the performance of the protein enrichment process can be deducted. Three replicates of QC1 are included in each fully loaded 96-well plate.

*See* Ex. 14 at 4.

56. Nanomics' platform currently has four automated workstations: the G1 Basic Workstation, the G1 Pro Workstation, the EV Purification Workstation, and the Protein Purification Workstation (collectively, "Proteonano Workstations"). Among other modules, Proteonano Workstations include magnetic separation and a heat-shaker for digestion, denaturation, and incubation.



*See* https://www.nanomics.ai/g1-pro-workstation.

57. Again, like Seer's platform, proteins are denatured, reduced, alkylated, and digested in the Proteonano Workstation and the peptides prepared for mass spectrometry, after which data is transferred to Nanomics' "Ai-powered proteomics analysis software."



*See* https://www.nanomics.ai/technology.

58.     On information and belief, Nanomics has had actual and/or constructive knowledge of the existence of the Asserted Patents by or shortly after each of their issue dates. For starters, there can be no doubt that Nanomics' knew of Seer and its products that embody the Asserted Patents; the field of proteomics research is close-knit and small, and Nanomics' CEO even mentioned Seer in public posts online.



*See* https://www.linkedin.com/posts/haowu-uchicago_ever-wondered-how-protein-coronas-can-activity-7373672214069456896-Ul5q (annotation added).

59.     By way of further example, Nanomics' publications mention Seer and cite to articles published by Seer regarding profiling the plasma proteome, further evidencing Nanomics' knowledge of the Asserted Patents embodied in Seer's products. *See* Ex. 15 at 5 ("[M]ass spectrometry-based nanoparticle-enriched plasma proteomics has seen remarkable advancements in recent years.") (citing Ex. 16); *see also* Ex. 16 (noting authorship of inventors

-26-

of the Asserted Patents, namely, William Manning, Hope Liou, Xiaoyan Zhao, Daniel Hornburg, and Omid Farokhzad, and further noting that the authors "have financial interest in Seer" and that "[o]nly Seer, and no other companies mentioned here, was involved in the study design, data collection and analysis, and manuscript writing/editing").

60. Nanomics has also attended conferences at which Seer presented its products embodying the Asserted Patents. For instance, Nanomics attended the US HUPO 2026 conference in St. Louis, Missouri, where researchers demonstrated the benefits of using Seer's Photograph Platform. *See* https://investor.seer.bio/news-releases/news-release-details/leading-scientists-demonstrate-how-seers-proteograph-product.



*See* https://www.linkedin.com/posts/nanomics-biotech_hello-from-st-louis-the-nanomics-team-activity-7431358525664276480-qbwQ.



*See* https://www.nanomics.bio/article-item-47.html.

61.     Nanomics' acts of infringing the Asserted Patents have therefore been willful and undertaken in knowing and deliberate disregard of Plaintiffs' patent rights.

**COUNT I**
**(Infringement of the U.S. 12,590,948 – On Behalf of Plaintiff Seer)**

62.      Paragraphs 1 through 61 are incorporated herein by reference as if fully set forth in their entirety.

63.     Seer has not licensed or otherwise authorized Nanomics to make, use, offer for sale, sell, or import any products that embody the inventions of the '948 patent.

64.     The '948 patent generally relates to novel systems and methods for identifying unique patterns in the proteome for diagnosing a biological state or condition in an organism, identifying markers based on the patterns, preparing diagnostics based on such markers, and commercializing and/or marketing diagnostics and services utilizing such diagnostics. *See* '948 patent at 5:55-61.

65.     Claim 1 of the '948 patent recites:

1.  A system for analyzing biological samples comprising:

(a) a sample preparation device comprising a separation device, a sample ionizer, and an ion excitation device, wherein the separation device is configured to deplete a sample of highly abundant proteins that are present in the biological sample at a concentration of at least 10 µg/mL;
(b) a mass spectrometer coupled to said sample preparation device; and
(c) a switch coupled to said ion excitation device.

66.     On information and belief, in violation of 35 U.S.C. § 271(a), Nanomics has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claim 1 of the '948 patent by and through making, using, offering to sell, and sale of the Accused Products.

67.     The use of the Accused Products meets every limitation of at least claim 1 of the '948 patent.  For example, and not by limitation, each of the Proteonano™ Workstations is a "sample preparation device" that practices the claim limitations through its use of "a heater-shaker module for nanoparticle-plasma incubation, a magnetic module for protein corona separation, and an 8-channel liquid handler for parallel pipetting."  Ex. 15 at 7.

68.     By way of further example, and not by limitation, the PUP Platform depletes highly abundant proteins present in a biological sample at a concentration of at least 10 µg/mL. Indeed, Nanomics published an article with a figure illustrating how albumin decreases in relative abundance in the PUP Platform to a concentration of 35-50 µg/mL.



*See* Ex. 11 at Fig. 4E-F.

69.     A non-limiting chart demonstrating how the Accused Products infringe at least claim 1 of the '948 patent is attached hereto as Exhibit 10.

70.     On information and belief, in violation of 35 U.S.C. § 271(b), Nanomics also indirectly infringed, and continues to indirectly infringe, at least claim 1 of the '948 patent with knowledge of, or being willfully blind that its actions constitute infringement, by specifically intending to induce its customers, distributors, and/or end users to directly infringe, either individually or jointly with Nanomics. Such inducement includes Nanomics taking active steps to encourage and facilitate others' direct and/or joint infringement of the '948 patent, including, without limitation, advertising, marketing, promoting, offering for sale and/or selling the Accused Products and providing instructions on how to use the Accused Products. For example, and not by limitation, Nanomics offers Proteonano G1 Pro Proteomics Workstation as well as the Proteonano Plasma Proteome Enrichment Kit on its website for commercial sale, along with an Operational Manual for the Proteonano Enrichment Kits:



*See* https://www.nanomics.ai/g1-basic-workstation.

-30-



*See* https://www.nanomics.ai/plasma-proteome-enrich-kit.



## 5.Important Preparation Steps

The performance of the Proteonano™ Plasma Proteome Enrich Kit is dependent on the maintenance and set up for LC-MS/MS, and proper execution of experimental steps outlined in Sections below. Thus, it is critical to use Proteonano™'s quality control system (QCS) to test the performance of LC-MS/MS setup and familiarize with experimental procedures before performing proteomic experiments using experimental samples.

*See* Ex. 17 at 1, 3.

71.     Nanomics also contributed, and continues to contribute, to infringement of the '948 patent by others, in violation of 35 U.S.C. § 271(c), by marketing and offering for sale to its customers, distributors, and/or end users the Accused Products, which are especially made for infringing use, with the knowledge that such use is infringing, and with the knowledge that the Accused Products are part of such infringing uses.  Additionally, the Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

72. On information and belief, Nanomics has had actual and/or constructive knowledge of the existence of the '948 patent by or shortly after its issue date. *See, e.g., supra* ¶¶ 58-60.

73. Nanomics' acts of infringing the '948 patent—directly, indirectly, and contributorily—have therefore been willful and undertaken in knowing and deliberate disregard of Seer's patent rights. Alternatively, Nanomics has had actual and/or constructive knowledge of the existence of the '948 patent since not later than the date it received service of this Complaint.

74. Because of Nanomics' direct, indirect, and contributory infringement of the '948 patent, Seer has suffered, and will continue to suffer, damages in an amount to be proven at trial.

75. Because of Nanomics' direct, indirect, and contributory infringement of the '948 patent, Seer has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law, unless Nanomics' infringement is enjoined by this Court.

76. On information and belief, Nanomics' willful infringement, together with its other conduct, render this case exceptional under 35 U.S.C. § 285 and thereby entitle Seer to recovery of its attorneys' fees and costs incurred in prosecuting this action.

## COUNT II
### (Infringement of the U.S. 11,630,112 – On Behalf of Plaintiff Seer)

77. Paragraphs 1 through 76 are incorporated herein by reference as if fully set forth in their entirety.

78. Seer has not licensed or otherwise authorized Nanomics to make, use, offer for sale, sell, or import any products that embody the inventions of the '112 patent.

79. The '112 patent generally relates to novel systems, methods, and kits for rapid and automated sample preparation, processing of proteomic data, and identifying key biomarkers

-32-

associated with disease states to help discover and advance diagnostic tools and therapeutic agents. *See* '112 patent at Abstract; *id.* at 1:19-22.

80. Before Seer disclosed the inventions in the '112 patent, there were a small number of protein-based biomarkers in use for clinical diagnosis, primarily because of the large number of proteins in the proteome and a lack of convenient molecular tools for proteome analysis. *See id.* at 18:18-29. This was true notwithstanding attempts by scientists to improve the detection of low abundance proteins, such as depletion of highly abundant proteins, plasma fractionation, and peptide fractionation. *Id.* at 18:44-47.

81. This bottleneck in scientific research prevented the early detection of certain diseases, like cancer, which change the composition of blood plasma. The '112 patent solved this bottleneck.

82. Claim 1 of the '112 patent recites:

1. An automated system for distinguishing states of a biological sample using a plurality of magnetic particles having surfaces with different physicochemical properties, the system comprising:
(a) a fluid transfer unit comprising a multichannel fluid transfer instrument for transferring fluids between units within the system;
(b) a sample storage unit comprising a support for storing a plurality of biological samples;
(c) a sensing unit comprising a support and a magnetic sensor array, wherein the magnetic sensor array is removably coupled to the support and comprises partitions that comprise the plurality of magnetic particles having surfaces with different physicochemical properties for binding a population of analytes within the biological sample, wherein the plurality of magnetic particles are configured to bind to at least 300 different proteins;
(d) a reagent storage unit comprising supports for storing a plurality of reagents;
(e) a waste unit comprising supports for storing a reagent to be disposed of;
(f) a consumable storage unit comprising supports for storing consumables for use by the multichannel fluid transfer instrument;
(g) a magnetized support, wherein the one or more processors are further programmed to transfer the magnetic sensor array to the magnetized support; and
(h) a control unit comprising one or more processors programmed to perform steps comprising:
i. contacting the biological sample with a partition of the magnetic sensor array;

-33-

ii. incubating the biological sample with the plurality of magnetic particles of the magnetic sensor array;
iii. removing components from the partition except the plurality of magnetic particles and the population of analytes interacting with the plurality of magnetic particles;
iv. adding a solution to the partition such that the population of analytes are desorbed from the plurality of magnetic particles; and
v. preparing the desorbed population of analytes comprising the at least 300 different proteins for mass spectrometry.

83. On information and belief, in violation of 35 U.S.C. § 271(a), Nanomics has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claim 1 of the '112 patent by and through making, using, offering to sell, and sale of the Accused Products.

84. The use of the Accused Products meets every limitation of at least claim 1 of the '112 patent. For example, and not by limitation, the Proteonano Enrichment Kits include a plurality of magnetic particles having surfaces with different physiochemical properties, including PP1, PP2, and PP3 particles. *See* Ex. 14 at 2; *see also* Ex. 15 at 29 ("the PUP Platform achieved cutting-edge deep plasma proteome coverage and data quality by effectively combining multiple nanoparticles into a single, uniform reagent"); Ex. 11 at 29 ("Here we provide three representative MMNPs, namely, $Fe_3O_4@Au$-PP1, $Fe_3O_4@Au$-PP2 and $Fe_3O_4@Au$-PP3").

**1. Proteonano nanoparticles**

The Proteonano Enrich Kit is composed of hierarchically structured nanoparticles functionalized with peptides (PCNPs). The physicochemical properties of three peptides used in this work are shown in Supplemental Table 1.

**Supplemental Table 1.** The physicochemical properties of three peptides

| Name | Sequence | Length | $M_w$ | Isoelectric Point | Charge (mV) | Hydrophobicity | GRAVY |
|------|----------|--------|-------|-------------------|-------------|----------------|-------|
| PP1 | HKAATKIQASFRGHIT RKKLC | 21 | 2,395 | 11.73 | 0.30 | 38% | -0.65 |
| PP2 | DIEEVEVRSKYFKKNE RTVEC | 21 | 2,602 | 4.90 | -1.04 | 62% | -1.22 |
| PP3 | QETLKDTRSKFFNKPS MTVVC | 21 | 2,460 | 9.73 | 1.95 | 48% | -0.63 |

-34-

85.     By way of further example, and not by limitation, the Proteonano Workstations include a "8-Channel Pipette" which is described as a "High-throughput liquid handling optimized for 96-well Proteonano workflows."  *See* https://www.nanomics.ai/g1-pro-workstation.



86.     Videos on Nanomics' website further demonstrate the multichannel fluid handler transferring fluid between units within the system, including for example by pipetting a mixture of nanoparticles in a singular long well, transferring the nanoparticle mixture from the well to the magnetic module GEN1, and injecting the nanoparticle mixture onto the 96-well plate on top of the magnetic module GEN1.







*See* "Nanomation™ G1 Pro" video, available embedded at https://www.nanomics.ai/g1-pro-workstation.

87.     Additionally, the Proteonano Enrichment Kits' magnetic particles are configured to bind to at least 300 different proteins.  For example, a Nanomics publication describes that from a sample of pooled plasma, mass spectrometers identified "2,987 $\pm$ 12 protein groups (AVG $\pm$ SE, n=3) at 180SPD and 3,817 $\pm$ 4 protein groups (AVG $\pm$ SE, n=3) at 100SPD." Ex. 15 at 16; *see also id.* at 10.



88.     A non-limiting chart demonstrating how the Accused Products infringe at least claim 1 of the '112 patent is attached hereto as Exhibit 7.

89.     On information and belief, in violation of 35 U.S.C. § 271(b), Nanomics also indirectly infringed, and continues to indirectly infringe, at least claim 1 of the '112 patent with knowledge of, or being willfully blind that its actions constitute infringement, by specifically intending to induce its customers, distributors, and/or end users to directly infringe, either individually or jointly with Nanomics. Such inducement includes Nanomics taking active steps to encourage and facilitate others' direct and/or joint infringement of the '112 patent, including, without limitation, advertising, marketing, promoting, offering for sale and/or selling the Accused Products and providing instructions on how to use the Accused Products. For example, and not by limitation, Nanomics offers Proteonano G1 Pro Proteomics Workstation as well as the Proteonano Plasma Proteome Enrichment Kit on its website for commercial sale, along with an Operational Manual for the Proteonano Enrichment Kits. *See, e.g.*, *supra* ¶ 70.

90.     Nanomics also contributed, and continues to contribute, to infringement of the '112 patent by others, in violation of 35 U.S.C. § 271(c), by marketing and offering for sale to its customers, distributors, and/or end users the Accused Products, which are especially made for infringing use, with the knowledge that such use is infringing, and with the knowledge that the Accused Products are part of such infringing uses.  Additionally, the Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

91.     On information and belief, Nanomics has had actual and/or constructive knowledge of the existence of the '112 patent by or shortly after its issue date.  *See, e.g.*, *supra* ¶¶ 58-60.

92.     Nanomics acts of infringing the '112 patent have therefore been willful and undertaken in knowing and deliberate disregard of Seer's patent rights.  Alternatively, Nanomics has had actual and/or constructive knowledge of the existence of the '112 patent since not later than the date it received service of this Complaint.

93.     Because of Nanomics' direct, indirect, and contributory infringement of the '112 patent, Seer has suffered, and will continue to suffer, damages in an amount to be proven at trial.

94.     Because of Nanomics' direct, indirect, and contributory infringement of the '112 patent, Seer has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law, unless Nanomics' infringement is enjoined by this Court.

95.     On information and belief, Nanomics' willful infringement, together with its other conduct, render this case exceptional under 35 U.S.C. § 285 and thereby entitle Seer to recovery of its attorneys' fees and costs incurred in prosecuting this action.

<u>**COUNT III**</u>
**(Infringement of U.S. 12,050,222 – On Behalf of Plaintiff Seer)**

96.    Paragraphs 1 through 95 are incorporated herein by reference as if fully set forth in their entirety.

97.    Seer has not licensed or otherwise authorized Nanomics to make, use, offer for sale, sell, or import any products that embody the inventions of the '222 patent.

98.    A continuation of the '112 patent, the '222 patent also generally relates to novel systems, methods, and kits for rapid and automated sample preparation, processing of proteomic data, and identifying key biomarkers associated with disease states to help discover and advance diagnostic tools and therapeutic agents. *See* '222 patent at Abstract; *id.* at 1:24-27.

99.    Before Seer disclosed the inventions in the '222 patent, there were a small number of protein-based biomarkers in use for clinical diagnosis, primarily because of the large number of proteins in the proteome and a lack of convenient molecular tools for proteome analysis. *See id.* at 18:22–42. This was true notwithstanding attempts by scientists to improve the detection of low abundance proteins, such as depletion of highly abundant proteins, plasma fractionation, and peptide fractionation. *Id.* at 18:48-51.

100.    This bottleneck in scientific research prevented the early detection of certain diseases, like cancer, which change the composition of blood plasma. The '222 patent solved this bottleneck.

101.    Claim 16 of the '222 patent recites

> 16. An automated system for preparing a biological sample for mass spectrometry analysis using a plurality of magnetic particles comprising at least one physicochemical property, the system comprising:
>
> (a) a fluid transfer unit comprising a multichannel fluid transfer instrument for transferring fluid between units within the system;

(b) a sample storage unit comprising a support for storing at least one biological sample;

(c) a sensing unit comprising a magnetic sensor array, wherein the magnetic sensor array comprises at least two partitions that comprise the plurality of magnetic particles wherein the plurality of magnetic particles comprises physicochemical properties configured to bind a population of proteins comprising at least 300 protein groups within a biological sample, wherein the plurality of magnetic particles comprises a polydispersity index of 0.01 to 0.1, and wherein the support is configured to immobilize the plurality of magnetic particles when the magnetic sensor array is transferred to the support;

(d) a reagent storage unit comprising supports for storing a plurality of reagents;

(e) a waste unit comprising supports for storing a reagent to be disposed of;

(f) a magnetized support comprising a magnetic source; and

(g) a control unit comprising one or more processors programmed to perform steps comprising:

i. incubating the biological sample with the plurality of magnetic particles of the magnetic sensor array under conditions sufficient to bind the population of proteins comprising at least 300 protein groups;

ii. applying the magnetized support to the magnetic sensor array to separate unbound sample from the plurality of magnetic particles;

iii. separating unbound components within the at least two partitions from the population of proteins and the plurality of magnetic particles; and iv. preparing the population of proteins for mass spectrometry, wherein the preparing comprises incubating a digestion solution with the population of proteins and the plurality of magnetic particles.

102. On information and belief, in violation of 35 U.S.C. § 271(a), Nanomics has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claim 16 of the '222 patent by and through making, using, offering to sell, and sale of the Accused Products.

103. The use of the Accused Products meets every limitation of at least claim 16 of the '222 patent. For example, and not by limitation, the Proteonano Enrichment Kits include a plurality of magnetic particles having surfaces with different physiochemical properties, including PP1, PP2, and PP3 particles. *See* Ex. 14 at 2; *see also* Ex. 15 at 29 ("the PUP Platform achieved cutting-edge deep plasma proteome coverage and data quality by effectively combining

-40-

multiple nanoparticles into a single, uniform reagent"); Ex. 11 at 29 ("Here we provide three representative MMNPs, namely, $Fe_3O_4$@Au-PP1, $Fe_3O_4$@Au-PP2 and $Fe_3O_4$@Au-PP3").

**1. Proteonano nanoparticles**

The Proteonano Enrich Kit is composed of hierarchically structured nanoparticles functionalized with peptides (PCNPs). The physicochemical properties of three peptides used in this work are shown in Supplemental Table 1.

**Supplemental Table 1.** The physicochemical properties of three peptides

| Name | Sequence | Length | $M_w$ | Isoelectric Point | Charge (mV) | Hydrophobicity | GRAVY |
|------|----------|--------|-------|-------------------|-------------|----------------|-------|
| PP1 | HKAATKIQASFRGHIT RKKLC | 21 | 2,395 | 11.73 | 0.30 | 38% | -0.65 |
| PP2 | DIEEVEVRSKYFKKNE RTVEC | 21 | 2,602 | 4.90 | -1.04 | 62% | -1.22 |
| PP3 | QETLKDTRSKFFNKPS MTVVC | 21 | 2,460 | 9.73 | 1.95 | 48% | -0.63 |

104.    By way of further example, and not by limitation, the Proteonano Workstations include a "8-Channel Pipette" which is described as a "High-throughput liquid handling optimized for 96-well Proteonano workflows." *See* https://www.nanomics.ai/g1-pro-workstation.



105.    Videos on Nanomics' website further demonstrate the multichannel fluid handler transferring fluid between units within the system, including for example by pipetting a mixture of nanoparticles in a singular long well, transferring the nanoparticle mixture from the well to the

magnetic module GEN1, and injecting the nanoparticle mixture onto the 96-well plate on top of the magnetic module GEN1.







*See* "Nanomation™ G1 Pro" video, available embedded at https://www.nanomics.ai/g1-pro-workstation.

106.    Additionally, the Proteonano Enrichment Kits contain multiple particle types that each bind a population of analytes within the biological sample, wherein the plurality of magnetic particles are configured to bind to at least 300 different proteins.  For example, a Nanomics publication describes that from a sample of pooled plasma, mass spectrometers identified "2,987 $\pm$ 12 protein groups (AVG $\pm$ SE, n=3) at 180SPD and 3,817 $\pm$ 4 protein groups (AVG $\pm$ SE, n=3) at 100SPD."  Ex. 15 at 16; *see also id.* at 10.



107.    A non-limiting chart demonstrating how the Accused Products infringe at least claim 16 of the '222 patent is attached hereto as Exhibit 8.

108.    On information and belief, in violation of 35 U.S.C. § 271(b), Nanomics also indirectly infringed, and continues to indirectly infringe, at least claim 16 of the '222 patent with knowledge of, or being willfully blind that its actions constitute infringement, by specifically intending to induce its customers, distributors, and/or end users to directly infringe, either individually or jointly with Nanomics.  Such inducement includes Nanomics taking active steps

-43-

to encourage and facilitate others' direct and/or joint infringement of the '222 patent, including, without limitation, advertising, marketing, promoting, offering for sale and/or selling the Accused Products and providing instructions on how to use the Accused Products. For example, and not by limitation, Nanomics offers Proteonano G1 Pro Proteomics Workstation as well as the Proteonano Plasma Proteome Enrichment Kit on its website for commercial sale, along with an Operational Manual for the Proteonano Enrichment Kits. *See, e.g.*, *supra* ¶ 70.

109. Nanomics also contributed, and continues to contribute, to infringement of the '222 patent by others, in violation of 35 U.S.C. § 271(c), by marketing and offering for sale to its customers, distributors, and/or end users the Accused Products, which are especially made for infringing use, with the knowledge that such use is infringing, and with the knowledge that the Accused Products are part of such infringing uses. Additionally, the Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

110. On information and belief, Nanomics has had actual and/or constructive knowledge of the existence of the '222 patent by or shortly after its issue date. *See, e.g.*, *supra* ¶¶ 58-60.

111. Nanomics' acts of infringing the '222 patent have therefore been willful and undertaken in knowing and deliberate disregard of Seer's patent rights. Alternatively, Nanomics has had actual and/or constructive knowledge of the existence of the '222 patent since not later than the date it received service of this Complaint.

112. Because of Nanomics' direct, indirect, and contributory infringement of the '222 patent, Seer has suffered, and will continue to suffer, damages in an amount to be proven at trial.

-44-

113.    Because of Nanomics' direct, indirect, and contributory infringement of the '222 patent, Seer has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law, unless Nanomics' infringement is enjoined by this Court.

114.    On information and belief, Nanomics' willful infringement, together with its other conduct, render this case exceptional under 35 U.S.C. § 285 and thereby entitle Seer to recovery of its attorneys' fees and costs incurred in prosecuting this action.

## COUNT IV
### (Infringement of U.S. 11,435,360 – On Behalf of All Plaintiffs)

115.    Paragraphs 1 through 114 are incorporated herein by reference as if fully set forth in their entirety.

116.    Plaintiffs have not licensed or otherwise authorized Nanomics to make, use, offer for sale, sell, or import any products that embody the inventions of the '360 patent.

117.    The '360 patent generally relates to a novel system and sensor array for detecting a wide range of diseases and disorders, and determining disease states in a subject by recognizing a biomolecular fingerprint from a sample.  *See* '360 patent at 2:11-17.

118.    Claim 1 of the '360 patent recites:

> 1.  A method for assaying a biological sample, comprising:
> (a) contacting the biological sample with a plurality of particles comprising different particle types to permit biomolecules of the biological sample to bind to the plurality of particles and form coronas around the plurality of particles, wherein the coronas corresponding to the different particle types (i) differ based on particle type, and (ii) comprise overlapping and distinct proteins;
> (b) separating at least a subset of the plurality of particles comprising the coronas from the biological sample by removing the subset of the plurality of particles thereby producing a subset of proteins from the biological sample;
> (c)  assaying the subset of proteins of (b) with an instrument to detect, in the subset, proteins in the biological sample at concentrations across a dynamic range comprising at least 6 orders of magnitude, thereby assaying the biological sample.

119.    Claim 3 of the '360 patent recites:

3. The method of claim 1, wherein the plurality of particles comprise iron oxide.

120. On information and belief, in violation of 35 U.S.C. § 271(a), Nanomics has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claim 3 of the '360 patent by and through making, using, offering to sell, and sale of the Accused Products.[3]

121. The use of the Accused Products meets every limitation of at least claim 3 of the '360 patent. Nanomics' process for assaying a biological sample includes contacting the biological sample with a plurality of particles comprising different particle types to permit biomolecules of the biological sample to bind to the plurality of particles and form coronas around the plurality of particles. For example, and not by limitation, Nanomics process uses a 96 well-plate in which the nanoparticles are incubated with the biological samples to form coronas. Ex. 15 at 7 (Nanomics' G1 workstation "includes a heater-shaker module for nanoparticle-plasma incubation" and "a magnetic module for protein corona separation"). Nanomics' PUP platform is meant to enable "[p]rotein enrichment by nano-bio interaction" to "selectively capture low abundant proteins in biological samples" in part by forming coronas. *See* "Nanomics: A Scalable and Standardized Workflow for Large-Cohort Proteomics" at 3; *see also* Ex. 15 at 7.

122. In the Nanomics process, the coronas correspond to the different particle types that (i) differ based on particle type, and (ii) comprise overlapping and distinct proteins. For example, and not by limitation, a Nanomics publication describing the Accused Technology

---

[3] In a recent *inter partes review* proceeding, the Patent Trial and Appeal Board found claims 2-3, 7, and 23-24 not unpatentable. *See PreOmics GmbH et al. v. BWH*, IPR2024-01473 (Mar. 23, 2026). Plaintiffs are not presently asserting any of claims 1, 4, 6, 17, 22, and 25 of the '360 patent in the instant action.

explains that the "Proteonano Kit is composed of AI-designed polypeptides to selectively bind and enrich low abundance proteins (LAPs) in biofluid samples with high specificity and sensitivity." Ex. 11 at 8; *see generally* Ex. 14; *see also* Ex. 15 ("the PUP Platform achieved cutting-edge deep plasma proteome coverage and data quality by effectively combining multiple nanoparticles into a single, uniform reagent[]").

123. Nanomics process also involves separating at least a subset of the plurality of particles comprising the coronas from the biological sample by removing the subset of the plurality of particles thereby producing a subset of proteins from the biological sample. For example, and not by way of limitation, the Nanomics' G1 workstation includes "a magnetic module for protein corona separation." Ex. 15 at 7.

124. Nanomics process also involves assaying the subset of proteins of (b) with a MS instrument to detect, in the subset, proteins in the biological sample at concentrations across a dynamic range comprising at least 6 orders of magnitude, thereby assaying the biological sample. For example, and not by way of limitation, Wu reported "the Proteonano workflow detected 123 FDA-cleared circulating plasma biomarkers spanning eight orders of magnitude from a single pooled plasma sample, markedly outperforming the neat plasma pipeline" Ex. 15 at 13; *see also* Fig. 4c below.



125. "For peptide identification, the platform incorporates three high-resolution mass spectrometers—Orbitrap 480, Astral instruments (ThermoFisher Scientific), and timsTOF Pro 2 (Bruker Corporation)"; "demonstrated exceptional capability for deep proteomic analysis of low-input plasma samples, achieving extensive proteome coverage, high throughput, a dynamic range spanning nine orders of magnitude[]". *Id.* at 7, 28.

126. Furthermore, the particles used in the Nanomics process are iron oxide particles. For example, and not by way of limitation, a Nanomics publication explains regarding the nanoparticles in the Accused Technology that "[t]he core layer consists of superparamagnetic $Fe_3O_4$ nanoparticles with a uniform diameter of 200 nm" (*see id.* at 12), and that "[t]he magnetic $Fe_3O_4$ particles were prepared according to a solvothermal approach." *Id.* at 33. *See also* Ex. 11 at 29 ("Here we provide three representative MMNPs, namely, $Fe_3O_4$@Au-PP1, $Fe_3O_4$@Au-PP2 and $Fe_3O_4$@Au-PP3.... One can see that the $Fe_3O_4$ nanoparticles have the relatively coarse surface and regular spherical shape with an average size of 200 nm. After modified with peptides, as shown in Figure S1E, the particle size increased to around 300 nm.").

127. A non-limiting chart demonstrating how the Accused Products infringe at least claim 3 of the '360 patent is attached hereto as Exhibit 6.

128. On information and belief, in violation of 35 U.S.C. § 271(b), Nanomics also indirectly infringed, and continues to indirectly infringe, at least claim 3 of the '360 patent with knowledge of, or being willfully blind that its actions constitute infringement, by specifically intending to induce its customers, distributors, and/or end users to directly infringe, either individually or jointly with Nanomics. Such inducement includes Nanomics taking active steps to encourage and facilitate others' direct and/or joint infringement of the '360 patent, including, without limitation, advertising, marketing, promoting, offering for sale and/or selling the

-48-

Accused Products and providing instructions on how to use the Accused Products. For example, and not by limitation, Nanomics offers Proteonano G1 Pro Proteomics Workstation as well as the Proteonano Plasma Proteome Enrichment Kit on its website for commercial sale, along with an Operational Manual for the Proteonano Enrichment Kits. *See, e.g.*, *supra* ¶ 70.

129. Nanomics also contributed, and continues to contribute, to infringement of the '360 patent by others, in violation of 35 U.S.C. § 271(c), by marketing and offering for sale to its customers, distributors, and/or end users the Accused Products, which are especially made for infringing use, with the knowledge that such use is infringing, and with the knowledge that the Accused Products are part of such infringing uses. Additionally, the Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

130. On information and belief, Nanomics has had actual and/or constructive knowledge of the existence of the '360 patent by or shortly after its issue date. *See, e.g.*, *supra* ¶¶ 58-60.

131. Nanomics' acts of infringing the '360 patent have therefore been willful and undertaken in knowing and deliberate disregard of Plaintiffs' patent rights. Alternatively, Nanomics has had actual and/or constructive knowledge of the existence of the '360 patent since not later than the date it received service of this Complaint.

132. Because of Nanomics' direct, indirect, and contributory infringement of the '360 patent, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be proven at trial.

133. Because of Nanomics' direct, indirect, and contributory infringement of the '360 patent, Plaintiffs have suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law, unless Nanomics' infringement is enjoined by this Court.

-49-

134. On information and belief, Nanomics' willful infringement, together with its other conduct, render this case exceptional under 35 U.S.C. § 285 and thereby entitle Plaintiffs to recovery of its attorneys' fees and costs incurred in prosecuting this action.

**COUNT V**
**(Infringement of U.S. 12,228,566 – On Behalf of All Plaintiffs)**

135. Paragraphs 1 through 134 are incorporated herein by reference as if fully set forth in their entirety.

136. Plaintiffs have not licensed or otherwise authorized Nanomics to make, use, offer for sale, sell, or import any products that embody the inventions of the '566 patent.

137. Being in the same family as the '360 patent, the '566 patent also generally relates to a novel system and sensor array for detecting a wide range of diseases and disorders, and determining disease states in a subject by recognizing a biomolecular fingerprint from a sample. *See* '566 patent at 2:18-24.

138. Claim 1 of the '566 patent recites:

> 1. A method of identifying a pattern of protein biomarkers from a biological fluid, wherein the method comprises:
> a. incubating magnetic particles that differ from each other in at least one physicochemical property with the biological fluid from a subject in a disease state to allow biomolecule coronas to form on surfaces of the magnetic particles, and wherein the pattern of protein biomarkers of the biomolecule coronas differs based on the different physicochemical properties of the magnetic particles;
> b. isolating the magnetic particles and the biomolecule coronas; and
> c. analyzing proteins of the biomolecule coronas by mass spectrometry to identify a relationship between a protein biomarker in the pattern of protein biomarkers and the disease state, wherein the analysis is performed at least in part using a computer.

139. On information and belief, in violation of 35 U.S.C. § 271(a), Nanomics has directly infringed, and continues to directly infringe, literally or under the doctrine of

equivalents, at least claim 1 of the '566 patent by and through making, using, offering to sell, and sale of the Accused Products.

140. The use of the Accused Products meets every limitation of at least claim 1 of the '566 patent. For example, and not by limitation, the Proteonano Enrichment Kits include a plurality of magnetic particles having surfaces with different physiochemical properties, including PP1, PP2, and PP3 particles. *See* Ex. 14 at 2; *see also* Ex. 15 at 29 ("the PUP Platform achieved cutting-edge deep plasma proteome coverage and data quality by effectively combining multiple nanoparticles into a single, uniform reagent"); Ex. 11 at 29 ("Here we provide three representative MMNPs, namely, $Fe_3O_4$@Au-PP1, $Fe_3O_4$@Au-PP2 and $Fe_3O_4$@Au-PP3").

**1. Proteonano nanoparticles**

The Proteonano Enrich Kit is composed of hierarchically structured nanoparticles functionalized with peptides (PCNPs). The physicochemical properties of three peptides used in this work are shown in Supplemental Table 1.

**Supplemental Table 1.** The physicochemical properties of three peptides

| Name | Sequence | Length | $M_w$ | Isoelectric Point | Charge (mV) | Hydrophobicity | GRAVY |
|------|----------|--------|-------|-------------------|-------------|----------------|-------|
| PP1 | HKAATKIQASFRGHIT RKKLC | 21 | 2,395 | 11.73 | 0.30 | 38% | -0.65 |
| PP2 | DIEEVEVRSKYFKKNE RTVEC | 21 | 2,602 | 4.90 | -1.04 | 62% | -1.22 |
| PP3 | QETLKDTRSKFFNKPS MTVVC | 21 | 2,460 | 9.73 | 1.95 | 48% | -0.63 |

141. By way of further example, and not by limitation, the Accused Products use biological fluid, *i.e.*, plasma, from a subject in a disease state. *See, e.g.*, Ex. 15 at 23 ("183 plasma samples were collected form the Hubei Memory and Aging cohort Study (HAMCS)…, which included two tests for global cognitive function…. In this experiment, a total of 195 plasma samples (Control: n = 125; Cognitive decline n – 58; QC: n = 12) were processed in six batches using the Proteonano workflow.").

142. A non-limiting chart demonstrating how the Accused Products infringe at least claim 1 of the '566 patent is attached hereto as Exhibit 9.

143. On information and belief, in violation of 35 U.S.C. § 271(b), Nanomics also indirectly infringed, and continues to indirectly infringe, at least claim 1 of the '566 patent with knowledge of, or being willfully blind that its actions constitute infringement, by specifically intending to induce its customers, distributors, and/or end users to directly infringe, either individually or jointly with Nanomics. Such inducement includes Nanomics taking active steps to encourage and facilitate others' direct and/or joint infringement of the '566 patent, including, without limitation, advertising, marketing, promoting, offering for sale and/or selling the Accused Products and providing instructions on how to use the Accused Products. For example, and not by limitation, Nanomics offers Proteonano G1 Pro Proteomics Workstation as well as the Proteonano Plasma Proteome Enrichment Kit on its website for commercial sale, along with an Operational Manual for the Proteonano Enrichment Kits. *See, e.g.*, *supra* ¶ 70.

144. Nanomics also contributed, and continues to contribute, to infringement of the '566 patent by others, in violation of 35 U.S.C. § 271(c), by marketing and offering for sale to its customers, distributors, and/or end users the Accused Products, which are especially made for infringing use, with the knowledge that such use is infringing, and with the knowledge that the Accused Products are part of such infringing uses. Additionally, the Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

145. On information and belief, Nanomics has had actual and/or constructive knowledge of the existence of the '566 patent by or shortly after its issue date. *See, e.g.*, *supra* ¶¶ 58-60.

146. Nanomics' acts of infringing the '566 patent have therefore been willful and undertaken in knowing and deliberate disregard of Plaintiffs' patent rights. Alternatively, Nanomics has had actual and/or constructive knowledge of the existence of the '566 patent since not later than the date it received service of this Complaint.

147. Because of Nanomics' direct, indirect, and contributory infringement of the '566 patent, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be proven at trial.

148. Because of Nanomics' direct, indirect, and contributory infringement of the '566 patent, Plaintiffs have suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law, unless Nanomics' infringement is enjoined by this Court.

149. On information and belief, Nanomics' willful infringement, together with its other conduct, render this case exceptional under 35 U.S.C. § 285 and thereby entitle Plaintiffs to recovery of its attorneys' fees and costs incurred in prosecuting this action.

## DEMAND FOR JURY TRIAL

150. Plaintiffs hereby demand a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that the Court enter judgment in its favor and against Nanomics as follows:

a. A judgment that Nanomics has infringed and continues to infringe (either literally or under the doctrine of equivalents) one or more claims of the Asserted Patents under at least 35 U.S.C. § 271(a);

b. An award of monetary damages sufficient to compensate Plaintiffs for Nanomics' patent infringement, with interest, pursuant to at least 35 U.S.C. § 284;

c. That Nanomics be ordered to pay Plaintiffs pre-judgment and post-judgment interest;

d. A permanent injunction prohibiting Nanomics and its officers, agents, representatives, assigns, licenses, distributors, servants, employees, related entities, attorneys, and all those acting in concert, privity, or participation with them, from:

    i. infringing or inducing infringement of any claim of the Asserted Patents, including by offering the Accused Products; and

    ii. soliciting any new business or new customers using any information or materials that Nanomics derived from its infringement of the Asserted Patents;

e. An award of enhanced damages of three times the amount found or assessed for Nanomics' willful patent infringement, pursuant to at least 35 U.S.C. § 284, including interest on such damages;

f. An order finding this case exceptional under 35 U.S.C. § 285 and awarding Plaintiffs all costs and attorneys' fees; and

g. Any and all other relief the Court deems just and equitable.

Dated: May 12, 2026

Respectfully submitted,

SEER, INC. AND THE BRIGHAM AND WOMEN'S HOSPITAL, INC.

By: /s/ Steven P. Mandell
    One of their attorneys

Jordan R. Jaffe (*pro hac vice* forthcoming)
Catherine R. Lacey (*pro hac vice* forthcoming)
**WILSON SONSINI GOODRICH & ROSATI PC**
One Market Plaza, Spear Tower, Suite 3300 San Francisco, CA 94105
Tel: (415) 947-2171

Michael T. Rosato (*pro hac vice* forthcoming)
Jad Mills (*pro hac vice* forthcoming)
**WILSON SONSINI GOODRICH & ROSATI PC**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
Tel: (206) 883-2529

Steven P. Mandell (ARDC No. 6183729)
smandell@mandellpc.com
**MANDELL P.C.**
1 North Franklin Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 801-6337

*Attorneys for Plaintiffs Seer, Inc. and The Brigham and Women's Hospital, Inc.*

-55-